USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 19, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

BRUNO KRASNIQI,                                    :
                                                   :
                              Petitioner,          :
                                                   :
              -v-                                  :         15-cv-7899 (KBF)
                                                   :         10-cr-464 (KBF)
UNITED STATES OF AMERICA,                          :
                                                   :
                              Defendant.           :
                                                   :
------------------------------------------------------------- :
                                                   :
SAIMIR KRASNIQI,                                   :
                                                   :         15-cv-7898 (KBF)
                              Petitioner,          :         10-cr-464 (KBF)
              -v-                                  :
                                                   :
UNITED STATES OF AMERICA,                          :         OPINION & ORDER
                                                   :
                              Defendant.           :
                                                   :
------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

        The Court has reviewed the motions, through counsel, of petitioners Bruno

Krasniqi and Saimir Krasniqi (collectively "Petitioners" or the "Krasniqis") to

vacate, set aside, or correct their sentences pursuant to 28 U.S.C. § 2255 on grounds

of ineffective assistance of counsel.  (Pet., 10-cr-464; 15-cv-7898, ECF No. 6; 15-cv-

7899, ECF No. 6.)[1]  Petitioners—who are brothers—were convicted after a five-week

jury trial of all of the crimes with which each was charged.  Those charges included,

inter alia, racketeering in violation of 18 U.S.C. § 1962(c), two counts of murder in

_____
[1] Unless otherwise noted, all citations to ECF in this Opinion & Order refer to the docket in case no.
10-cr-464.  Because both motions have been briefed jointly and raise identical issues, the Court
resolves both motions together in this single decision.

aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), kidnapping in aid of

racketeering in violation of 18 U.S.C. § 1959(a)(1), narcotics trafficking in violation

of 21 U.S.C. § 846, conspiracy to commit robbery in violation of 18 U.S.C. § 1951,

obstruction of justice in violation of 18 U.S.C. 1512(c), and possession and use of

firearms in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  The Court sentenced each

Petitioner to an aggregate term of life imprisonment, plus 30 years.

The Krasniqis appealed their convictions on several grounds, including that

the evidence was insufficient to support several of the counts of conviction, the trial

court improperly precluded cross-examination of a law enforcement witness, and

Bruno Krasniqi was deprived of his right to his counsel of choice when the trial

court allowed the Government to introduce evidence relating to his attorney.  The

Second Circuit affirmed the Krasniqis' convictions by unpublished disposition.

United States v. Krasniqi, 555 F. App'x 14 (2d Cir. 2014) (summary order).  The

Second Circuit subsequently denied a petition for rehearing.  Thereafter, the

Krasniqis sought writs of certiorari from the United States Supreme Court; their

petitions were denied.  United States v. Krasniqi, 135 S. Ct. 294 (2014).

Petitioners now argue that they received ineffective assistance of counsel at

trial on the grounds that counsel purportedly failed to: (1) call certain witnesses and

pursue potential alibi defenses, and (2) object when Petitioners' parents were

allegedly told to leave the courtroom during part of jury selection.  These arguments

are wholly without merit, and for the reasons set forth below, Petitioners' motions

are DENIED.

No evidentiary hearing is necessary in this action. The combined submissions of the parties provide a sufficient basis upon which to deny the motions.  The Court concludes that a full testimonial evidentiary hearing would not offer any reasonable chance of altering its view on the facts as alleged by Petitioners, including the details added in their motions and supporting affidavits.  See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (court need not hold an evidentiary hearing where the combined submissions of the parties provide a sufficient basis to deny the petition).

I.      BACKGROUND

      A.      Indictment

On May 27, 2010, brothers Bruno Krasniqi and Saimir Krasniqi were charged in a sealed indictment (ECF No. 5); each was arrested on June 8, 2010. The Krasniqis were subsequently charged in a series of superseding indictments, the last of which—the ninth superseding indictment—was filed on September 22, 2011 (the "Indictment").  (ECF No. 277.)  The Indictment alleged that the Krasniqis led an organized criminal enterprise from approximately 2002 up to 2010 and charged them in eleven counts, as follows: (1) racketeering—with predicate acts that included narcotics conspiracy, interstate transportation of stolen property, robbery, conspiracy to murder, kidnapping, murder, obstruction of justice and arson—in violation of 18 U.S.C. § 1962(c); (2) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (3) narcotics conspiracy, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B), and 846; (4) robbery conspiracy, in violation of 18 U.S.C. § 1951; (5) use and carrying of a firearm during and in relation to a drug trafficking crime, in

violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(B)(ii), and 2; (6) kidnapping in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (7) use and carrying of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; (8) murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (9) murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (10) conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k); and (11) obstruction of justice, in violation of 18 U.S.C. §§ 1512(c) and 2.

B.    <u>Trial</u>

The Krasiniqis chose to proceed to trial.  A jury trial on the Indictment, presided over by the Hon. Richard J. Holwell, commenced on October 31, 2011, and ended on December 6, 2011.  Bruno Krasniqi was represented at trial by Kelley J. Sharkey; Saimir Krasniqi was represented by Avraham C. Moskowitz and Avrom J. Robin.  As further detailed below, the evidence at trial established that the Krasniqis supervised and led an organized criminal enterprise (the "Krasniqi Organization")—that began operating in Detroit, Michigan, in around 2002, and moved to New York City in late 2003—that engaged in numerous criminal activities.  Those crimes included, <u>inter alia</u>, murder, kidnapping, robbery, extortion and narcotics trafficking.  The Government's evidence at trial included the testimony of several cooperating witnesses (including three former members of the Krasniqi Organization and two members of a rival criminal organization), a kidnapping victim, and several law enforcement officers, as well as physical evidence, telephone toll records, and photographs and other documentary evidence. That evidence established the following facts.

4

Evidence introduced at trial demonstrated that the Krasniqis immigrated to the United States from Albania and settled in Detroit, Michigan. (Trial Tr. at 253-54, 263.) There, the Krasniqis established a criminal network in Detroit that included Oliger Merko, Kejtol Manoku, Elton Sejdaris, and Florian Veshi. The group discussed schemes to extort businesses and use guns, and committed violent crimes together. (Trial Tr. at 257-58, 287, 316-17.) The evidence showed, for instance, that in 2003, Merko shot Abaz Hussenllari, a former criminal associate of the group, because Hussenllari had not paid the Krasniqis and Merko for crimes the men had committed for him; the Krasniqis were present for the shooting. (Trial Tr. at 319, 324-26.) After Merko was arrested for the shooting, the Krasniqis demanded money for Merko's bail from their distant relative, Arben Dinkollari, whose violent kidnapping they had previously participated in. (Trial Tr. at 327, 329-30, 1339-57, 1365-66.)

In late 2003, after several criminal associates had been arrested in Detroit, the Krasniqis relocated to New York City, where they recruited additional associates—including Erkliant Sula, Almir Rrapo, and Gentian Kasa—to join their criminal enterprise. (Trial Tr. at 255, 689.) Sejdaris and Veshi also followed the Krasniqis to New York within several months thereafter. (Trial Tr. at 258.) As explained below, the Krasniqi Organization went on to commit numerous crimes in New York (as well as additional crimes in Detroit), including marijuana trafficking, robbing drug suppliers, and kidnapping and murdering rival gang members.

The evidence at trial established that, between 2003 and 2010, members of the Krasniqi Organization sold thousands of pounds of marijuana obtained from suppliers in Detroit, New York, and Canada.  (Trial Tr. at 278-79, 364-75, 383-86, 1499-1501, 1538, 1906, 1949-56, 2293.)  The evidence also established that members of the Krasniqi Organization stole from drug suppliers, including in a 2004 incident in Ohio in which Saimir and Sula drove away with marijuana that belonged to a drug supplier based in Canada while the supplier's courier was in a rest stop bathroom, and then delivered the drugs to Bruno.  (Trial Tr. at 398-404, 1517, 1519-22.)  A pistol that Saimir and Sula had intended—but ultimately did not need—to use to execute the robbery was subsequently recovered by law enforcement after a prostitute hired by Saimir and other members of the Krasniqi Organization called the police following a dispute during a celebration held by Sejdaris, Sula, Saimir, and Veshi.  (Trial Tr. at 398, 407-10, 1510-11, 1517, 1521, 1543-46, 2085-87.)

Among the Krasniqi Organization's suppliers of marijuana was a man named Parid Gjoka and his associates (collectively, the "Gjoka Crew"), who sold the Krasniqis hundreds of pounds of marijuana in 2004 and 2005.  (Trial Tr. at 1906, 1949-56.)  After receiving approximately 20 pounds of marijuana on consignment from Gjoka in the spring of 2005, the Krasniqis—sensing that Gjoka was vulnerable—arranged to meet with him in the hope of muscling him out of his share of the proceeds.  (Trial Tr. at 1991-92, 1994-95, 2353-54.)  On the day of the meeting, the Krasniqis refused Gjoka's demand for payment for the drugs they had received on consignment, and Bruno hit Gjoka and chased him away without paying

6

for the marijuana.  (Trial Tr. at 428-30, 433-34, 1994-2005, 2358-63.)  Following this incident, the Gjoka Crew plotted to retaliate by shooting the Krasniqis and their associates, while the Krasniqi Organzation simultaneously plotted to kill Gjoka and his associates, purchasing several firearms, bullet proof vests and hollow-point bullets to achieve that end.  (Trial Tr. at 358, 435, 1169-73, 1548, 1931, 2002, 2007-09, 2300-03, 2305.)  The Krasniqis at one point hired a hit man to kill Gjoka, and then subsequently hunted for Gjoka themselves (along with other members of the Krasniqi Organization), but could not find him.  (Trial Tr. at 458-61, 1587-89, 2294-96, 2363-64, 2370-73, 2407.)

In an effort to find Gjoka, the Krasniqis and other members of the Krasniqi Organzation located and kidnapped Neritan Kocareli—a member of the Gjoka Crew—at gunpoint.  (Trial Tr. at 441-44, 1079, 1097, 1176-77, 2376-78.)  They questioned Kocareli about Gjoka's whereabouts and physically beat and threatened him over several hours, after which Kocareli ultimately agreed to help find Gjoka. (Trial Tr. at 444-46, 450-57, 1080, 1185, 1191, 1193-94, 1196-97, 1200-02, 2380-81, 2384, 2387-88.)  Kocareli also told them that Erion Shehu, one of Gjoka's best friends, was plotting to kill the Krasniqis, which led the Krasniqi Organization to target Shehu.  (Trial Tr. at 468, 1198, 2388.)  The evidence at trial showed that on Sunday, July 17, 2005, members of the Krasniqi Organization murdered Shehu by shooting him several times in his car; the evidence showed that the Krasniqis directly participated in the killing.  (Trial Tr. at 471-73, 1725-26, 2272, 2280, 2433-40.)  The Krasniqis and other participants in the murder subsequently threw the

7

guns they had used into the water near the Verrazano-Narrows Bridge; one of those guns was later found by the FBI.  (Trial Tr. at 2302, 2442-45, 2665-69, 2720.)

In 2005, the Krasniqis stole approximately 100 pounds of marijuana from a supplier based in Canada, who subsequently abducted and beat Bruno in retaliation for the theft.  (Trial Tr. at 486-87, 489-93, 1593.)  After Saimir attempted to raise ransom money and notified the FBI, the kidnappers eventually freed Bruno on the FBI's demand.  (Trial Tr. at 494-98, 963-64, 2457.)  On a recorded telephone call that occurred prior to the release, one of the kidnappers had told Saimir that he wanted his money back.  (Trial Tr. at 894-95.)  Following Bruno's release, the Krasniqis lied to FBI agents about the reason for the kidnapping.  Saimir claimed that he and Bruno were targeted because their parents were wealthy (Trial Tr. at 496, 915, 987), while Bruno claimed that the kidnapping may have resulted from an argument over a parking spot and denied any involvement in drug dealing (Trial Tr. at 987.)

The Krasniqis suspected Erenick Grezda—the man who had introduced them to the Canadian drug supplier—of betraying Bruno to the kidnappers.  On January 13, 2006, the Krasniqis and several associates met with Grezda at Sejdaris's and Veshi's apartment.  (Trial Tr. at 502-04, 531, 1604.)  After Grezda said that the Canadian supplier was still demanding $250,000 as payment for the stolen marijuana, the Krasniqis asked to speak to Grezda in private in Sejdaris's bedroom, where they forced him to strip naked to determine if the kidnappers had actually beaten him as he claimed.  (Trial Tr. at 504, 531-32.)  Finding no such indication,

8

the Krasniqis appeared to conclude that Grezda had willingly worked with the kidnappers to capture Bruno.  (Trial Tr. at 532.)

Having reached the conclusion that Grezda betrayed them, the Krasniqis told him that they would get the money demanded by the Canadian supplier, and drove with Grezda and Sejdaris with the supposed intention to pick up the money.  (Trial Tr. at 505-08, 1610-12.)  During the drive, Bruno shot Grezda twice in the head, and Saimir pulled over and dragged Grezda's body out of the car and dumped it alongside the highway.  (Trial Tr. at 512-17.)  Saimir then drove to a spot near the Verrzano-Narrows Bridge and tossed the gun that Bruno had used into the water. (Trial Tr. at 518-20.)  The men then drove to a nightclub, where they told Sula and Veshi what happened and discussed how to get rid of the evidence, including Sejdaris's vehicle.  (Trial Tr. at 521, 523-25, 1613-16.)  The men took Sejdaris's blood-soaked vehicle to New Jersey, where they set it on fire; Sejdaris later filed a false police report and fraudulent insurance claim, stating that the car had been stolen.  (Trial Tr. at 527-29, 1617-21, 1712-17.)  On January 14, 2016, police officers in South Brunswick, New Jersey, found the car engulfed in flames, and officers with the New York City Police Department found Grezda's body on an exit ramp off the Brooklyn-Queens Expressway.  (Trial Tr. at 216-17, 1695, 1699-1701.)  An autopsy revealed that Grezda's cause of death was two bullet wounds to the head.  (Trial Tr. at 181, 198, 2730-32.)

Around July 2005, the Krasniqis, Kasa and Rrapo got into an argument outside of a coffee shop on Staten Island with the shop owner and his friend, during

which Kasa tried to stab the owner's friend.  (Trial Tr. at 476-78, 1565-67, 2392, 2395.)  A man named Nino came out of the shop carrying a gun and shot at the Krasniqis and their associates, in response to which Rrapo returned fire.  (Trial Tr. 478-79, 1567, 2396-97.)  The Krasniqis, Kasa and Rrapo then drove to the house of a man named Gesi, who they believed was allied with Nino and had given Nino the gun he used to shoot at them.  (Trial Tr. at 483, 2398.)  Rrapo and Bruno, who was carrying a Tec-9 machine gun, forced Gesi to get into their car and instructed Gesi to take them to Nino's apartment.  (Trial Tr. at 2400.)  Bruno fired his Tec-9 at the door, but then realized that Nino was not home and left with Gesi.  (Trial Tr. at 484-85, 1573, 2402-04.)  Rrapo later pulled Gesi out of the car and fired a gun near Gesi's head to scare him; Bruno then fired his Tec-9 in Gesi's direction as Gesi ran away.  (Trial Tr. at 484, 2405-06.)

In addition to the above criminal conduct, the evidence at trial also showed that that the Krasniqis extorted business owners in Detroit and New York.  For instance, the evidence showed that the Krasniqis and others extorted $5,000 from a coffee shop owner in Detroit (Trial Tr. at 317-18), and also discussed extorting an Albanian man who owned a trucking company in Detroit (Trial Tr. at 322-23, 686).  The evidence also established that, after arriving to New York, the Krasniqis associated with an Italian mafia figure named "Vinny Boy" and helped him collect extortion payments from businesses located in Chinatown and Staten Island.  (Trial Tr. at 346-50, 1470, 2454.)

In addition to cross-examination of the Government's witnesses that challenged their credibility, the defense case rested primarily on a number of character witnesses.  The defense's character witnesses testified about legitimate jobs that the Krasniqis held during the time they were purportedly running the Krasniqi Organization.  (Trial Tr. at 2910-16, 2923-29, 2932-34.)  The defense also presented the testimony of John Fiordaliso, a retired NYPD sergeant who worked as security at various night clubs in Brooklyn, who testified as a character witness and stated that the Krasniqis had prevented an unruly patron from stabbing him and that Sejdaris (but not the Krasniqis), often got into trouble at night clubs where Fiordaliso worked.  (Trial Tr. at 3014-19.)  The defense also presented the testimony of an inmate who had been housed in prison with Sejdaris (one of the Government's cooperating witness at trial), who testified that Sejdaris had told him that he planned to lie at the Krasniqis' trial about their criminal activities.  (Trial Tr. at 3047-52.)  Finally, the defense called Henry Scharg, an attorney who had previously represented the Krasniqis pre-trial, who testified that the Krasniqis referred him to Merko in connection with the prosecution for the shooting of Abaz Hussenllari, and that, after Bruno was kidnapped, Saimir had contacted him, which led Scharg to call the FBI.  (Trial Tr. at 2941-43, 2950-54.)

On December 6, 2011, the jury returned a verdict of guilty as to all counts in which the Krasniqis were charged.

C.   <u>Sentencing and Direct Appeal</u>

On June 26, 2012, the Krasniqis both appeared before this Court—which had been reassigned the case as a result of Judge Holwell's retirement—for sentencing.

(Sentencing Tr., ECF No. 412.)  The Court sentenced each of the Krasniqis principally to an aggregate term of life imprisonment, plus 30 years.  (Judgment (Bruno), ECF No. 403; Judgment (Saimir), ECF No. 404.)  The Krasniqis appealed their convictions and sentences.  (ECF Nos. 407, 408.)  Their appeals to the Second Circuit (and subsequent petitions for rehearing) were unsuccessful, and their petitions for writs of certiorari to the Supreme Court were denied on October 6, 2014.  See United States v. Krasniqi, 555 F. App'x 14 (2d Cir.), cert. denied, 135 S. Ct. 294 (2014).

On October 6, 2015, the Krasniqis brought the instant motions to vacate, set aside, or correct their sentences pursuant to 28 U.S.C. § 2255.  (Pet., 15-cv-7898, ECF No. 1; Pet., 15-cv-7899, ECF No. 1.)[2]  The Government opposed the motions on April 21, 2016.  (Gov't's Opp. Br., 15-cv-7899, ECF No. 15.)  The Krasniqis replied on July 5, 2016.  (Pet'rs' Reply Br., 15-cv-7899, ECF No. 20.)

## II.  LEGAL STANDARDS

### A.  Bar on Raising Issues That Were Raised or Could Have Been Raised on Direct Appeal

"In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal."  United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011).  "An exception applies, however, if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence."  Id.  This procedural bar "does not generally apply to claims of

---

[2] Because the original motions were filed on the docket with information that the Court believed was more appropriately filed under seal (see 15-cv-7899, ECF No. 4), the Krasniqis re-filed their motions with appropriate redactions on October 20, 2015 (15-cv-7898, ECF No. 6; 15-cv-7899, ECF No. 6).

ineffective assistance of counsel." <u>Zhang v. United States</u>, 506 F.3d 162, 166 (2d Cir. 2007).

    B.    <u>Ineffective Assistance of Counsel</u>

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) his or her counsel's performance "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and (2) he or she was prejudiced by counsel's deficient performance such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>. 466 U.S. 668, 687-88, 694 (1984).

As to the first prong of <u>Strickland</u>, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel.  <u>Id.</u> at 688-89.  As a result, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." <u>United States v. Aguirre</u>, 912 F.2d 555, 560 (2d Cir. 1990) (alterations and quotation marks omitted) (quoting <u>Strickland</u>, 466 U.S. at 689).  Petitioners must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Harrington v. Richter</u>, 562 U.S. 86, 104 (2011).

As to the second prong of <u>Strickland</u>, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the result would have been different.  <u>Strickland</u>, 466 U.S. at 694.  More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."  <u>Id.</u> at 693.

III.    DISCUSSION

Petitioners argue that their respective attorneys at trial provided ineffective assistance by failing to: (1) call certain witnesses and pursue potential alibi defenses and (2) object to the alleged exclusion of the Krasniqis' parents from the courtroom on the first day of jury selection.[3]  Petitioners support these claims with vague and otherwise self-serving affidavits submitted by themselves, their parents, and the two individuals whom they assert would have provided valuable alibi testimony—John Fiordaliso and Alina Tafa (referred to herein by her maiden name, Alina Saiti).  Petitioners also seek to rely on a declaration from William Donald, Judge Holwell's former courtroom deputy, that largely relates to certain of his general practices in that job.  As set forth below, having given appropriate weight to all of this material, Petitioners' arguments fail both prongs of the <u>Strickland</u> analysis.  The Krasniqis have failed to show that their attorneys' performances fell

---

[3] The Court notes that Petitioners' brief focuses on the failings of Bruno's trial counsel, Ms. Sharkey, and they do not allege with any specificity how Saimir's attorneys at trial were separately ineffective.  To the extent that their grounds for relief are based on ineffective assistance from Bruno's counsel relating to his individual defense, those bases do not apply to Saimir, who was separately represented at trial.  The Court need not address this issue, however, in light of its conclusion that the motions otherwise lack merit.

14

below an objective standard of reasonableness, or that—in light of the

overwhelming evidence of their guilt—counsel's purported errors had any

conceivable effect on the outcome of the trial.  Accordingly, the Krasniqis' motions

must be denied.  Below, the Court addresses each of the Krasniqis' arguments in

turn.

       A.    <u>Counsel's Failure to Call Witnesses and Pursue Alibi Defenses</u>

       Petitioners first assert that their attorneys did not provide effective

assistance because they did not call several witnesses who could have provided alibi

evidence and/or general character evidence.  Specifically, Petitioners contend that

counsel was ineffective for failing to call John Fiordaliso (a former NYPD officer and

friend of Bruno who was called at trial solely as a character witness) and Alina Saiti

(Bruno's girlfriend) as alibi witnesses and for failing to call the Krasniqis' parents

and girlfriends as character witnesses.  This argument also rests, in part, on

Petitioners' assertion that the evidence against them was "hardly overwhelming"

because it relied principally on the quantity of witnesses testifying pursuant to

cooperation agreements, rather than on the quality of their testimony or on

wiretaps, other surveillance evidence, or direct physical evidence.  Based on the

Court's review of the evidence presented at trial, this characterization is far off the

mark—the evidence at trial overwhelmingly supported the Krasniqis' participation

in the alleged racketeering organization and their guilt with respect to each of the

crimes charged.  As explained below, it was not unreasonable for counsel to decide

not to call the witnesses that the Krasniqis identify in light of the purported

testimony they would have provided, and doing so would not reasonably have altered the outcome of the trial.

        1.   <u>Factual Support</u>

Petitioners first assert that counsel should have called Fiordaliso and Saiti, relying on the supporting affidavits they have received from those witnesses regarding the alibi testimony they would have provided for Bruno if called upon. Those affidavits state as follows.

In his affidavit, Fiordaliso states that he is a retired NYPD officer who first met Bruno Krasniqi in the summer of 2005 when Bruno started coming to a nightclub in Bay Ridge, Brooklyn, at which Fiordaliso provided security.  (Fiordaliso Aff. ¶¶ 1-2, 15-cv-7899, ECF No. 6-4.)  Fiordaliso states that Bruno was a regular at the club and was there every Friday night, generally until closing, and sometimes came with Saimir.  (Fiordaliso Aff. ¶ 2.)  Fiordaliso goes on to state that, although he does not have a perfect recollection of Friday, January 13, 2006 (i.e. the night of Grezda's murder), he is confident that around that period Bruno was at the club every Friday night, and was usually there alone or with Saimir.  (Fiordaliso Aff. ¶ 4.)  After the Krasniqis' arrest, Fiordaliso told them that he was willing to testify as a defense witness and met with Ms. Sharkey and told her about his experiences with the Krasniqis.  (Fiordaliso Aff. ¶ 5.)  Fiordaliso further states that although he testified at trial as a character witness, he was not asked about Bruno's regular practice of being at the night club that Fiordaliso worked at every Friday night around the time of Grezda's murder.  (Fiordaliso Aff. ¶ 6.)

In her declaration, Saita states that she dated Bruno on and off between 2004 and 2009.  (Saita Decl. ¶ 1, 15-cv-7899, ECF No. 20-2.)  Saita and Bruno frequently spent time together on weekends while they were dating, particularly in the summer of 2005.  (Saita Decl. ¶ 2.)  Saita states that she and Bruno did not spend the night together since they were living at their parents' homes, but routinely stayed together into the early morning hours on weekends.  (Saita Decl. ¶ 2.)  Saita further states that although she does not have a specific recollection of the night of Sunday, July 17, 2005 (i.e. the night of Shehu's murder), she believes that she and Bruno would have spent time together that night.  (Saita Decl. ¶ 2.)  Saita also states that, if called as a witness at trial, she could have provided character evidence by testifying that she did not meet or otherwise know any of the other individuals charged in the criminal action except for Saimir and Sejdaris (who are both Bruno's relatives) and that Bruno did not spend time with any of those other individuals while they were dating.  (Saita Decl. ¶ 3.)  She states that she never would have dated Bruno if she believed he was involved in any criminal activity, and there was no reason for her to believe that he was involved in any unlawful conduct during the years they were dating.  (Saita Decl. ¶ 3.)  Saita states that although she met with Ms. Sharkey and was told she would be called at trial, Saita was never called because she was told she "wasn't needed."  (Saita Decl. ¶ 4.)

In addition to the affidavits from Fiordaliso and Saita, the Krasniqis have also submitted affidavits from their parents, Mylazim Krasniqi and Liliana Krasniqi (collectively, the "Krasniqi Parents"), who each—in almost identical

fashion—explain the testimony they would have provided if called at trial. (See Liliana Krasniqi Aff., 15-cv-7898, ECF No. 6-14; Mylazim Krasniqi Aff., 15-cv-7898, ECF No. 6-15.)[4] The Krasniqi Parents state that they were interviewed by their sons' attorneys several times (both before and after Mr. Scharg withdrew as counsel) and understood from their conversations that they would be called as defense witnesses at trial. (Liliana Aff. ¶ 2; Mylazim Aff. ¶ 2.)  The Krasniqi Parents state that they told their sons' attorneys that Bruno and Saimir lived with them in a two-bedroom apartment and shared the same bedroom (except for the period when the Krasniqis lived in Detroit), held regular jobs, wore modest clothing, and didn't do anything that suggested they had income outside of their regular jobs. (Liliana Aff. ¶ 3; Mylazim Aff. ¶ 3.)  The Krasniqi Parents also discussed with counsel that the Krasniqis did not socialize with Sejdaris and they never heard of any of the other people named in the charges.  (Liliana Aff. ¶ 3; Mylazim Aff. ¶ 3.) The Krasniqi Parents further state that Bruno and Saimir were well-behaved, and they never would have allowed their sons to continue living with them if they ever possessed or talked about a gun or otherwise discussed being involved in criminal activity.  (Liliana Aff. ¶ 3; Mylazim Aff. ¶ 3.)  The Krasniqi Parents state that although they expected to be called as witnesses, none of the attorneys ever asked or called them to testify (and did not provide the Krasniqi Parents with any explanation for this decision).  (Liliana Aff. ¶ 7; Mylazim Aff. ¶ 7.)

---

[4] The Krasniqi Parents' affidavits also describe their purported removal from the courtroom during jury selection.  The Court separately discusses their factual assertions in relation to that issue below.

Finally, Petitioners have submitted their own affidavits describing what they perceive to have been their attorneys' failings at trial, including not calling certain additional witnesses. Bruno's affidavit explains that he retained Henry Scharg to defend him after his June 2010 arrest, and that Kelly Sharkey also became assigned to represent him in August 2010, when he became unable to afford his legal expenses. (Bruno Krasniqi Aff. ¶ 3, 15-cv-7899, ECF No. 6-5.) Bruno states that when Mr. Scharg was forced to withdraw, Ms. Sharkey took over his defense and—at Bruno's request—met with several of his family members (including extended family who lived out of state), Alina Saiti, and John Fiordaliso, to determine if they could provide helpful testimony at trial. (Bruno Aff. ¶¶ 4, 5, 7.) Bruno states that although he repeatedly asked Ms. Sharkey to call his parents and others as witnesses, she declined to do so (Bruno Aff. ¶¶ 6, 8, 10); Saimir similarly states that he wanted his attorneys, Avrom Robin and Avi Moskowitz, to call his parents and his girlfriend, but they chose not to do so (Saimir Krasniqi Aff. ¶¶ 3, 5, 15-cv-7898, ECF No. 6-16). Bruno and Saimir each also assert that their respective attorneys erred in failing to call: (1) Ijon Komberi, who told a defense investigator that Rrapo and Kasa said they killed Shehu themselves, and (2) Ljusa Nuculovic, a now-deceased federal prisoner who, if subpoenaed, the Krasniqis assert would have been able to testify that Nuculovic's co-defendants had killed Shehu. (Bruno Aff. ¶ 11; Saimir Aff. ¶ 6.)

2. <u>Analysis</u>

To prevail on their ineffective assistance claim relating to counsel's failure to call certain witnesses and pursue potential alibi defenses, the Krasniqis must first

show that their respective attorneys' performances "fell below an objective standard of reasonableness" measured under "prevailing professional norms." Strickland, 466 U.S. at 688.  In relation to a claim that an attorney provided ineffective assistance by not calling certain potential witnesses, "[c]ourts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005). "'[C]ounsel's decision as to whether to call specific witnesses–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation.'" Id. (quoting United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000)).  Furthermore, with respect to a claim that an attorney did not adequately pursue investigative leads, although defense counsel has a general duty to conduct reasonable investigation, a claim of ineffective assistance based on such an argument requires that the petitioner provide evidence that undermines confidence in the jury's verdict.  Castellano v. United States, 795 F. Supp. 2d 272, 279 (S.D.N.Y. 2011); see also United States v. Wilson, No. 11-CR-770-2 (WFK), 2015 WL 7574471, at *5 (E.D.N.Y. Nov. 25, 2015).  The duty to reasonably investigate does not "compel counsel to investigate comprehensively every lead or possible defense or to scour the globe on the off-chance something will turn up." Greiner, 417 F.3d at 321 (citations and quotation marks omitted).  As set forth below, the Krasniqis have not shown that it was unreasonable for their respective attorneys to not call the witnesses they identify or pursue the alibis they raise in light of the vague and uncorroborated testimony these witnesses would apparently have provided if called.

First, the Krasniqis contend that Fiordaliso and Saiti would have been important alibi witnesses by testifying that they would have been with Bruno at the times of the Grezda and Shehu murders, respectively, as part of a general routine. Neither Fiordaliso nor Saiti, however, would have offered testimony that amounted to a true alibi defense.  By their own admissions, they did not have any specific recollection of being with Bruno on the nights of those murders, nor do the general routines they describe suggest that Bruno could not have been with them on those nights and still nonetheless participated in those murders.  Particularly given that this testimony would have been uncorroborated by any other evidence, it would have added little to Bruno's defense.  Moreover, the Government submitted an affidavit from Ms. Sharkey in support of its opposition to the petitions, in which she indicates that, although she met with Saiti and Fiordaliso, and considered calling Saiti as a witness and expanding Fiordaliso's testimony to encompass an alibi for Bruno, she decided to pursue neither avenue for strategic reasons.  (Sharkey Aff. ¶¶ 4-5, 15-cv-7899, ECF No. 15-1.)  Although she did not further disclose these strategic reasons, the record suggests that this was an entirely reasonable course of action under the circumstances, given the weak support this testimony would have offered.

Second, the Krasniqis contend that their respective attorneys provided ineffective assistance because they chose not to call either of the Krasniqi Parents as character witnesses.  As described above, the Krasniqi Parents state that, if called, they would have testified, <u>inter alia</u>, that their sons held regular jobs and

lived with them, and that they did not know their sons to engage in illegal activity or associate with their co-defendants.  It was not unreasonable for the Krasniqis' attorneys to elect to not call the Krasniqi Parents given that several other character witnesses were called who testified to these same general topics.  (Trial Tr. at 2910-16, 2925-29, 2933-34.)  The testimony would have been merely cumulative of the evidence otherwise presented by defense counsel.  United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (rejecting ineffective assistance claim where the defendant asserted that a witness should have been called who would have "testified in a manner corroborative of another witness" because "counsel might well have regarded the testimony as unnecessarily cumulative").  Furthermore, in light of the fact that the Krasniqi Parents clearly had an interest in the outcome of the trial and would have been cross-examined on that interest, it is highly doubtful that their testimony regarding character would have been any more helpful to the defense.

Third, in their own affidavits, the Krasniqis argue that their attorneys should have called Komberi and Nuculovic as alibi witnesses because they would have testified that other people confessed to them about killing Shehu without the Krasniqis' involvement.  Without affidavits from either of these witnesses, the Krasniqis' self-serving, uncorroborated and improbable assertions are insufficient to establish that their attorneys provided ineffective assistance.  See Chang, 250 F.3d at 86; Skinner v. Duncan, No. 01 Civ.6656 DAB AJP, 2003 WL 21386032, at *39 (S.D.N.Y. June 17, 2003).  The Court notes, moreover, that the credibility of these

witnesses would have been undermined if both had been called, as they offered inconsistent accounts as to the identities of the participants in Shehu's murder.

Additionally, even if the Krasniqis could succeed on the first <u>Strickland</u> prong, their arguments relating to the failure to call the aforementioned witnesses and pursue alibi defenses nonetheless still fail on the second prong, which requires Petitioners to show prejudice as a result of counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 688.  To satisfy this prong, Petitioners must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  The focus of the prejudice component is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993).

The Krasniqis have plainly failed to meet that standard.  They have not shown that their respective counsels' decisions to not call the witnesses they identify altered the outcome of the trial or rendered it fundamentally unfair.  Based on the Court's review of the trial proceedings, there is no reason to believe that the presentation of the testimony these witnesses purportedly would have offered would have been sufficiently credible to produce a different verdict on any count for either defendant in light of the overwhelming evidence of guilt presented by the Government through its numerous witnesses and other evidence linking the Krasniqis to the crimes of conviction.

B.    Counsel's Failure to Object to the Removal of the Krasniqi Parents

The Krasniqis next assert that they were deprived of effective assistance when their respective attorneys failed to object to the purported closure of the courtroom and the removal of their parents on the first day of jury selection.  See Johnson v. United States, 520 U.S. 461, 468 (1997) (including the right to a public trial as among the class of structural defects affecting the framework within which a trial proceeds); Press-Enter. Co. v. Superior Court of California, Riverside Cnty., 464 U.S. 501, 505 (1984) (affirming right to public jury selection).  They contend that counsel failed to object to their deprivation of their Sixth Amendment right to a public trial without the Court making the necessary findings under Waller v. Georgia, 467 U.S. 39, 48-49 (1984).  The Court first details the factual assertions supporting this claim, and then explains why this ineffective assistance claim lacks merit.

1.    Factual Support

Jury selection in this action commenced on October 31, 2011, at approximately 2:16 p.m.  (Oct. 31, 2011 Tr., ECF No. 337.)[5]  Jury selection resumed on November 1, 2011, beginning at approximately 9:43 a.m., and concluded when the jury was impaneled at approximately 4:55 p.m. that day.  (Gov't Opp Br., Ex. 3, 15-cv-7899, ECF No. 15-3.)  The Krasniqis acknowledge that the October 31, 2011 transcript "contains no statements by the court or court personnel, no objections from any of the attorneys, nor any other reference to the [Petitioners'] family

---

[5] Prior to the commencement of jury selection, the Court held a Daubert hearing—beginning at approximately 9:45 a.m. on October 31—regarding the admissibility of ballistics testimony.  (Gov't Opp. Br., Ex. 2, 15-cv-7899, ECF No. 15-2.)

members being instructed to leave." (Pet'rs' Opening Br. at 10.) Rather, the Krasniqis rely on their own affidavits and those of their parents (as well as an affidavit from Judge Holwell's former courtroom deputy that largely describes his general practices), to establish the facts and circumstances of the courtroom closure. Those affidavits set forth the following facts.

The Krasniqi Parents (again, in nearly identical affidavits), state that they arrived to the court at around 9:00 a.m. on the morning of October 31, 2011 and sat in the first or second row behind the table where their sons and their sons' attorneys were sitting. (Liliana Aff. ¶ 5; Mylazim Aff. ¶ 5.) The Krasniqi Parents state that they sat while the attorneys had a discussion at the Judge's bench for about two hours, after which Judge Holwell's deputy came and told them that "the jury would be chosen and that we were not allowed to be there" without giving any further explanation. (Liliana Aff. ¶ 5; Mylazim Aff. ¶ 5.) The Krasniqi Parents state that the attorneys, and a nearby Albanian translator, saw this happening but did not say or do anything. (Liliana Aff. ¶ 5; Mylazim Aff. ¶ 5.)[6] The Krasniqi Parents proceeded to the hallway outside the courtroom, where they waited until "a man who [they] understood to be an FBI agent" told them—without giving an explanation—that they could not wait in the hall either. (Liliana Aff. ¶ 6; Mylazim Aff. ¶ 6.) Not knowing their rights, the Krasniqi Parents went home. (Liliana Aff. ¶

---

[6] Nor did they ask the translator for assistance. (Liliana Aff. ¶ 5; Mylazim Aff. ¶ 5.)

6; Mylazim Aff. ¶ 6.)  The Krasniqi Parents state that they subsequently attended every day of the trial.  (Liliana Aff. ¶ 7; Mylazim Aff. ¶ 7.)[7]

Bruno and Saimir (using identical language to each other) testify that their parents were in the courtroom on October 31, 2011, before jury selection when they overheard Judge Holwell's courtroom deputy tell their parents "they would have to leave."  (Bruno Aff. ¶ 9; Saimir Aff. ¶ 4.)  The Krasniqis state that they asked their attorneys what was happening, but were told that "it was time to pick the jury and not to worry about it," and that their attorneys did not object to the Krasniqi Parents being told to leave and did not explain why.  (Bruno Aff. ¶ 9; Saimir Aff. ¶ 4.)  The Krasniqis state that their parents returned to watch the trial the following day.  (Bruno Aff. ¶ 9; Saimir Aff. ¶ 4.)

Finally, along with their reply brief, the Krasniqis have submitted a declaration from William Donald, Judge Holwell's courtroom deputy at the time of the trial in this action.  (Donald Decl. ¶ 1, 15-cv-7898, ECF No. 19-1.)  Mr. Donald states that his responsibilities included ensuring the smooth operation of jury selection and that, "[b]ecause the number of people in groups of potential jurors often exceeded the number of seats available in the courtroom, it was sometimes necessary [for him] to request that members of the audience leave the courtroom

---

[7] In their reply brief, the Krasniqis contend that their parents were actually excluded for the entirety of jury selection, including on the second day, November 1, 2011, despite the fact that the Krasniqis state in their affidavits that their parents returned to court the following day after they were told to leave.  (Pet'rs' Reply Br. at 4-5, 15-cv-7899, ECF No. 20; see Bruno Aff. ¶ 9; Saimir Aff. ¶ 4.)  The Court disregards this factual assertion because there has been no allegation that any member of the public was excluded by any court personnel on November 1, 2011, or that the Krasniqi Parents were told they could not attend that day's proceedings.  Whether the Krasniqi Parents simply chose not to return on November 1 does not implicate any public trial rights.  Therefore, for purposes of considering Petitioners' argument, the Court accepts, at most, that the Krasniqi Parents purport to have been excluded by court personnel on the afternoon of October 31, 2011.

during jury selection to allow sufficient seating for prospective jurors." (Donald Decl. ¶ 1.) He further states that "[a]lthough seating is provided for members of the public, sometimes during the voir dire portion of the trial, the public is asked to move their seat or use another courtroom for the overflow of observers." (Donald Decl. ¶ 2.) He does not state, however, that it was ever his practice to exclude all members of the public from the courtroom to accommodate the jury pool. Mr. Donald states that he does not have a specific recollection of the jury selection for the Krasniqis' trial, but did recall "that this particular jury trial had a large jury pool of about 150 people,"[8] and that the Krasniqi Parents "did not speak English or have the assistance of an interpreter." (Donald Decl. ¶ 2.) Ms. Sharkey, for her part, also has no memory of the Krasniqi Parents being excluded from the courtroom. (Sharkey Aff. ¶ 6.)

### 2.   Analysis

Even assuming that Mr. Donald did instruct the Krasniqi Parents to leave the courtroom and that an overflow room to watch the proceedings was not made available to them—propositions as to which the Court has serious doubts on this record[9]—the Krasniqis' courtroom closure-related ineffective assistance claim still

---

[8] Mr. Donald states that Judge Holwell's courtroom gallery had space for approximately 75-90 people. (Donald Decl. ¶ 1.)

[9] The Court is highly skeptical that the facts set forth by the Petitioners even make out a "plausible claim" that the jury selection proceedings were actually closed to the public in the first instance. See Puglisi v. United States, 586 F.3d 209, 213-14 (2d Cir. 2009). As discussed above, the transcript from the jury selection on October 31, 2011, contains no statement or any other reference to family members of the defendants being instructed to leave the courtroom, nor do Ms. Sharkey or Mr. Donald have any recollection of the Krasniqi Parents being excluded from the courtroom. Moreover, this is the first time that the Krasniqis or their parents have raised this claim, approximately four years after the purported events transpired; this raises serious doubts as to the credibility of their assertions. The Krasniqis did not raise this issue at any time during their lengthy trial or on direct

fails.  They have not shown that any failure to object fell below minimally

acceptable standards of representation, nor can they demonstrate that they suffered

any prejudice as a result of such failure.  The Court sets forth these two grounds

below.

As stated above, under Strickland's first prong, the Krasniqis must show that

their respective attorneys' failure to object to the purported courtroom closure "fell

below an objective standard of reasonableness" measured under "prevailing

professional norms."  Strickland, 466 U.S. at 688.  When considering Strickland's

first prong, the Court must "reconstruct the circumstances of counsel's challenged

conduct, and . . . evaluate the conduct from counsel's perspective at the time."  Id. at

689.  In Morales v. United States, 635 F.3d 39 (2d Cir. 2011), the Second Circuit

considered whether an alleged failure by counsel to object to the purported removal

of two of the defendant's family members during jury selection—in violation of the

Sixth Amendment right to a public trial—fell outside the range of reasonable

assistance.  Id. at 43-45.  After noting that there was no evidence that defense

counsel or anyone else knew of the alleged courtroom closure until the two family

member affiants came forward years after the fact, and that none of the lawyers

representing any of the defendant's ten co-defendants lodged an objection or raised

a point of appeal regarding the alleged closure, the Second Circuit stated "there is a

strong reason to believe defense counsel was not aware of any closure and thus

---

appeal, despite ample opportunity to do so.  Additionally, as indicated above, the Krasniqi Parents'
affidavits are mirror images of each other, as are the Krasniqis' own affidavits on this topic,
rendering each inherently less credible.  Finally, in light of the Krasniqi Parents' limited capacity to
understand English, it is quite plausible that they misunderstood Mr. Donald's instruction and that
he never in fact told them to leave the courtroom.

cannot be faulted for failing to raise an issue about which he had neither knowledge nor reason to know." Id. at 44.  The Second Circuit further stated that, even assuming that counsel was aware of the purported courtroom closure, the failure to object was not unreasonable given that "the closure lasted not much longer than one morning out of a multi-month trial" and that, although peremptory challenges were taken on the day of closure, the questioning of potential jurors as to their fitness or bias had occurred earlier and was undisputedly left open to the public. Id.  The Court found that, under the circumstances, it would not be unreasonable for a defense attorney aware of the closure to believe that the petitioner's trial "had been unaffected notwithstanding the public's absence." Id. at 45.[10]

The facts in Morales are highly similar to those before the Court on this record; its reasoning properly governs here.  As in Morales, the Krasniqis have alleged that the courtroom was closed for a matter of hours to two members of the public on one day of jury selection out of a several week trial, and have set forth no facts showing that any individuals were excluded from the courtroom on any other trial day, including during the bulk of jury selection that continued on November 1.  As in Morales, no attorney—neither the two attorneys representing Saimir nor the one attorney representing Bruno—made any objection to the purported closure

---

[10] The Krasniqis cite to United States v. Gupta, 699 F.3d 682 (2d Cir. 2011), but that case is inapposite.  Gupta involved a claim for a Sixth Amendment violation on a direct appeal; in that case the defendant did not have to show ineffective assistance of counsel under Strickland.  Furthermore, in contrast to this case, in Gupta it was undisputed that the public was intentionally excluded at the direction of the Court for the entirety of jury selection, without the district court having made any Waller findings.  Gupta, 699 F.3d at 687.  Nor is the Krasniqis' reliance on Waller itself availing, as that case involved an undisputed total courtroom closure as to all members of the public.  See Waller, 467 U.S. at 42.

either at trial or on direct appeal. To the extent that counsel was unaware of and

had no reason to know that Mr. Donald told the Krasniqi Parents to leave, counsel

cannot be faulted for failing to raise the issue with the Court. Morales, 635 F.3d at

44 (citing United States v. Cronic, 466 U.S. 648, 656 n.19 (1984)). To the extent

that defense counsel was actually aware of the closure—an allegation supported

only by the Krasniqis' self-serving identical statements that each asked counsel

"what was happening"—the Court concludes that it would not have been

unreasonable for counsel to believe that the Krasniqis' trial rights had been

unaffected given the limited nature of the closure. Id. at 44-45; see also Gibbons v.

Savage, 555 F.3d 112, 121 (2d Cir. 2009) (finding closure of courtroom too "trivial"

to justify overturning conviction on a § 2254 habeas petition); United States v.

Patton, 502 F. App'x 139, 142 (3d Cir. 2012) (unpublished); Bucci v. United States,

662 F.3d 18, 31-32 (1st Cir. 2011) (not ineffective assistance to fail to object to

partial courtroom closure even when counsel was aware of it). Counsel's

performance was therefore not constitutionally deficient in this regard.

Even if the Krasniqis could satisfy the first Strickland prong, their

arguments relating to the purported courtroom closure during the first day of jury

selection nonetheless still fail on the second prong. The second prong requires

Petitioners to show prejudice as a result of counsel's deficient performance such

that the result of the trial was unreliable or the proceeding was rendered

fundamentally unfair. Strickland, 466 U.S. at 688; Lockhart, 506 U.S. at 372.

Here, the Krasniqi have not—and cannot—show that the composition of the jury

would have been different if their parents (who, in any event, apparently spoke little, if any, English) had been present during the first few hours of jury selection, or that there is a reasonable probability that the result of the proceeding would have been different.  See United States v. Gomez, 705 F.3d 68, 76 (2d Cir. 2013); Daughtry v. Greiner, No. 01-2466, 2002 WL 31819589, at *2 (2d Cir. Dec. 16, 2002) (summary order).  To the extent relevant for this sort of purported structural defect, the Krasniqis also cannot show prejudice in light of the overwhelming evidence of guilt that the Government presented at trial.

IV.    CONCLUSION

For the reasons set forth above, Petitioners' motions to vacate, set aside, or correct their sentences under 28 U.S.C. § 2255 are DENIED.

The Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see Matthews v. United States, 682 F.3d 180, 185 (2d Cir. 2012).  The Court also finds, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from the denial of this motion would not be taken in good faith.  See Feliz v. United States, Nos. 01 Civ. 5544(JFK), 00 CR. 53(JFK), 2002 WL 1964347, at *7 (S.D.N.Y. 2002).

The Clerk of Court is directed to terminate the actions at 15-cv-7898 and 15-cv-7899.

SO ORDERED.

Dated:          New York, New York
                July 19, 2016

KATHERINE B. FORREST
United States District Judge